## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, William Moore, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, which was recovered pursuant to a Federal search warrant a Light Blue GMC Suburban (Yukon) with Alaska License Plate EFM 426, which was located at 1979 Peger Road, Fairbanks, Alaska 99709, All property is currently located at the ATF Satellite Office, Fairbanks, Alaska and are identified as;

   a. 4 Black micro SD card

   b. Black Motorola, Model: MB809, S#: SJUG6167AA

   for evidence of the unlawful distribution of a controlled substance, the possession with intent to distribute and conspiracy to commit those offenses in violation of Title 21, USC Section 841 (a)(1) and Section 846.

2. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since January

2002. I am assigned to the Seattle Field Division, Fairbanks Satellite Office, Fairbanks, Alaska. Prior to my current position with ATF, I was employed with the Salt Lake County Sheriff's Office, Utah, for approximately five years.

3. Your affiant is a graduate of the Federal Law Enforcement Training Center, ATF National Academy, United States Army Military Police School (MOS 95B), United States Army Counterintelligence Agents Course (MOS 97B), Utah P.O.S.T Academy and Nevada P.O.S.T. Academy. As a result of your affiant's training and experience as an ATF Special Agent, your affiant is knowledgeable with Federal Laws and violations.

4. Your affiant is attached to the Alaska Statewide Drug Enforcement Unit from July of 2010 and has assisted in numerous drug related investigations. One of the investigations I have assisted on with the Alaska Statewide Drug Enforcement Unit involved the controlled purchase of illegal narcotics from numerous individuals, to include the controlled delivery of illegal narcotics from numerous individuals.

5. The statutory provisions to which the current investigation relates include; Title 21, United States Code, Section 841 (a) (1) and 846, the distribution of controlled substances, the possession of controlled substances with intent to distribute, as well as the conspiracy to commit those violations. Your affiant is familiar with the provisions of these statues and based upon my training and experience, Your affiant believes that the items described in this affidavit and which are sought by this application for search warrant are fruits, evidence and instrumentalities of violations under Title 21, United States Code, Section 841 (a) (1) and 846.

6. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7. The property to be searched;

   a. 4 Black micro SD card

   b. Black Motorola, Model: MB809, S#: SJUG6167AA

8. The applied-for warrant would authorize the examination of these Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9. August 1, 2013, the Express Mail Parcel EK 091590035 US addressed to Jason HEIM 3570 Erin Drive North Pole, Alaska 99705, "from" Paul Velazquez, 125 W. Olive Drive, Apt A, San Ysidro was identified during an interdiction by Postal Inspectors. A Federal Search Warrant was obtained (Magistrate number 4;13-MJ-0035-SAO) from United States Magistrate Scott A. Oravec, Fairbank, Alaska, for the Express Mail Parcel EK 091590035 US.

10. On the same date, approximately 4:00PM, Federal search warrant 4-13-MJ-

00035-SAO was executed on Express Mail Parcel EK 091590035 US. The parcel contained approximately 204 gram of gross weight of a white crystal substance. The white crystal substance was inside three layers of Ziplock bags wrapped in a dyer sheet and several layers of plastic tape, which was inside carbon paper inside a yellow "Scotch" bubble mailer envelope. A NIK field test was performed on the white crystal substance which indicated positive for methamphetamines.

11. Your Affiant knows that this amount of methamphetamines coupled with the average percentage of purity of methamphetamines would suggest that this methamphetamines would be consistent with 50 grams or more of actual methamphetamines and not a personal use amount.

12. On August 2, 2013 an order authorizing the installation and monitoring of an electronic alerting device and tracking device was obtained (Magistrate Number 4:13-MJ-00037-SAO) from United State Magistrate Judge Scott A. Oravec, Fairbanks Alaska, for the subject parcel EK 091590035 US.

13. Law enforcement officers removed the original 204 Grams gross weight of methamphetamines and inserted a sham product into the parcel. A representative sample of the methamphetamines was also placed in to the subject parcel. On August 2, 2013, State, Local and Federal Agents set up a perimeter around 3570 Erin Drive, North Pole, Alaska 99705. On the same date, at approximately 3:10 PM postal inspectors delivered the subject parcel to 3570 Erin Drive, North Pole, Alaska 99705. A white male answered the door and signed for the subject parcel using the name Keith Harvey. Harvey stated to the inspector that Jason would most likely be by later to pick up the parcel. The inspector left the property.

14. At approximately 4:30 PM Law Enforcement officers identified a light blue GMC Suburban with Alaska license plate EFM 426 pull up to 3570 Erin Drive, North Pole, Alaska 99705. Law Enforcement Officers than saw a white male exit the vehicle and enter the address. The White male exited that address with the subject parcel and get into the light blue Suburban. Law Enforcement Officers identified the white male to be Jason Carl HEIM, and that he was not the driver of the vehicle. The vehicle then left the address. The vehicle was later identified to be driven by NEWMAN.

15. At approximately 4:40 Law Enforcement Officers followed the light blue suburban until it reach it's final destination at abandoned trailer at the corner of Branch and Gordon, North Pole Alaska. This location was in the area of NEWMAN's residence.

16. At approximately 4:50 PM the electronic monitoring device indicated that the parcel was opened. Agents waited approximately 4 minutes and then executed Federal Warrant 4:13-MJ-00037-SAO. The Suburban was parked to the left of the abandoned house and in front of an abandoned vehicle. The suburban was parked to conceal it from the road.

17. When agents approached the scene two males, NEWMAN and HEIM, were outside the suburban standing in front of the abandoned vehicle with the contents of the parcel on the hood of the abandoned vehicle. While securing NEWMAN and HEIM officers discovered the express Mail envelope of the subject parcel crumpled up in a tire between the abandoned vehicle and the abandoned trailer. HEIM also made a spontaneous statement that they (NEWMAN and HEIM) were driving to NEWMAN residence, but had to stop to take a "piss".

18. The Sham narcotics and the contents of the subject parcel had been covered in

"Clue Spray". When an individual touches the object with "Clue Spray" on it the individual's hands or any other object that came into contact with the "Clue Spray" will glow when placed under a black light. Law Enforcement officers did observe a glow consistent with the "Clue Spray" on NEWMAN's hands and forearms when subjected to a black light. HEIM's hands and forearms showed no glow when subjected with a black light. When HEIM was taken into custody he was also wearing gloves which also showed no glow when subjected to a black light.

19. The light blue suburban with Alaska license plate EFM 426 is registered to Sharon Hopkins at 2641 Lancelot Drive, E, North Pole Alaska 99705. When viewing the address 2641 Lancelot Drive, E, North Pole Alaska 99705 from Google Earth Internet application the light blue suburban can be seen at the address. It is common knowledge that Sharon Hopkins is NEWMAN's girlfriend that lives at the same address. NEWMAN's Alaska driver license shows the same address. NEWMAN has several vehicles registered to the address of 2641 Lancelot Drive, E, North Pole, Alaska 99705, with the first vehicle being registered around the year 2006 to present.

20. Your affiant conducted an Alaska vehicle registration check and also discovered that the GMC vehicle with Alaska license plate GGPP963 is registered to both NEWMAN and HOPKINS at the 2641 Lancelot Drive, E, North Pole, Alaska 99705.

21. On August 3, 2013, a search warrant for the Light Blue GMC Suburban (Yukon) with Alaska License Plate EFM 426was obtained from United State Magistrate Judge Scott A. Oravec, Fairbanks Alaska,.

22. On August 3. 2013, Federal, and local Law Enforcement executed the

aforementioned Federal search warrants and the following items were recovered during the execution of the Federal Search warrant on Light Blue GMC Suburban (Yukon) with Alaska License Plate EFM 426, which was located at 1979 Peger Road, Fairbanks, Alaska 99709.

    a. 4 Black micro SD card

    b. Black Motorola, Model: MB809, S#: SJUG6167AA

23. Your affiant's experience has found that the distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money.

24. It is common for members of drug trafficking organizations to maintain telephonic communications before, during and after drug transactions. Calls, electronic mail and/or text messages are often made between the drug source of supply and the drug recipient,

prior to departure of a drug courier and upon arrival of a drug courier at the destination. Once at the destination, it is common for the courier to contact the recipient, via the telephone. Records of such contacts, whether call logs or text messages, are frequently maintained in the cellular telephone's memory.

25. It is common for members of drug trafficking organizations to maintain communications with computers through means of the internet (ie. Facebook and Twitter) and electronic mail.

26. It is common for individuals involved in drug trafficking to use multiple cellular telephones to maintain contact with their associates. These individuals use multiple cellular telephones because cellular telephones are mobile and can be easily obtained with a different subscriber name. A different subscriber name and/or telephone number is often used by members of a drug trafficking organization to thwart law enforcement detection of their illicit drug trafficking activities. These different telephone numbers often have different subscriber names and/or are pre-paid cellular telephones where the subscriber is difficult to determine. Due to the fact that several different telephone numbers may be used, it is common for traffickers of controlled substances to maintain the names and telephone numbers of associates within the cellular telephone memory. These associate names and telephone numbers may be stored in historical call logs, text messaging history or within the contacts section of the cellular telephone.

27. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances,

large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). I also know that the aforementioned images are frequently maintained in the memory of cellular telephone devices or on computers.

28. These Devices are currently in the lawful possession of the Alaska State Troopers Evidence Room, 1979 Peger Road, Fairbanks, Alaska 99709. It came into the Alaska State Troopers' possession following the execution of the Federal Search Warrant on February 1, 2012. Therefore, while the Alaska State Troopers' might already have all necessary authority to examine these Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

29. These Devices are currently in storage at Alaska State Troopers Evidence Room, 1979 Peger Road, Fairbanks, Alaska 99709. In my training and experience, I know that the devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when these Devices first came into the possession of the Alaska State Troopers.

## TECHNICAL TERMS

30. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data

communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

31. Based on my training, experience, and research, I know that these devices have capabilities that allow them to serve as follows;

h. cell phones is a wireless telephone, digital camera, portable media player, GPS navigation device, internet and PDA

i. Laptop computer is a wireless telephone, digital camera, portable media player, GPS navigation device, internet, tablet and PDA

32. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

33. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

34. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this

Page 14

information.

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of these devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of these devices to human inspection in order to determine whether it is evidence described by the warrant.

36. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

37. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of these devices described in Attachment A to seek the items described in Attachment B.

Redacted Signature

William Moore, Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives
Fairbanks Satellite Office, Alaska

Subscribed and sworn to before me this 5th day of September, 2013.

Redacted Signature

Scott A. Oravec
United States Magistrate Judge